# In the United States Court of Federal Claims

No. 19-1176
Filed: February 20, 2020
Reissued: March 11, 2020[1]

|  |  |  |
|---|---|---|
| AECOM MANAGEMENT SERVICES, INC., | ) ) ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | |
| THE UNITED STATES, | ) ) ) | Post-Award Bid Protest; Judgment on the Administrative Record; RCFC 52.1; Tucker Act; Multiple Award Task Order Contract; Indefinite-Delivery Indefinite-Quantity Contract; Task Order Contract; Administrative Procedure Act; Arbitrary and Capricious; Technical/Management Approach; Labor Staffing Model. |
| Defendant, | ) ) | |
| and | ) ) | |
| KELLOGG, BROWN & ROOT SERVICES, INC., VECTRUS SYSTEMS CORPORATION, FLUOR INTERCONTINENTAL, INC., and PAE-PARSONS GLOBAL LOGISTICS SERVICES, LLC, | ) ) ) ) ) ) ) | |
| Defendant-Intervenors. | ) ) | |

*Jeffery Mitchell Chiow*, Rogers Joseph O'Donnell, PC, Washington, DC, for plaintiff.

*Vincent de Paul Phillips*, U.S. Department of Justice, Civil Division, Washington, DC, for defendant.

*Andrew Emil Shipley*, Wilmer Cutler, et al., LLP, Washington, DC, for defendant-intervenor, Fluor Intercontinental, Inc. *Anuj Vohra*, Crowell & Moring LLP, Washington, DC, for defendant-intervenor, PAE-Parsons Global Logistics Services, LLC. *Kevin Patrick Mullen*, Morrison & Foerster, LLP, Washington, DC, for defendant-intervenor, Vectrus Systems Corporation. *Lee Paul Curtis*, Perkins Coie, Washington, DC, for defendant-intervenor, Kellogg, Brown & Root Services, Inc.

---

[1]     An unredacted version of this opinion was issued under seal on February 20, 2020. The parties were given an opportunity to propose redactions, but no such proposals were made.

**OPINION AND ORDER**

*SMITH*, Senior Judge

  The central purpose of federal procurement law is to ensure that competition for government contracts, which are funded by tax payer dollars, is fair to both the government and to contractors.  Only when competition is fair and open can the government get what it pays for, and can the contractor receive fair value for the work and goods it provides.  If the system is not fair, the tax payer will be cheated, and honest contractors will be unwilling to contract with the government.  Accordingly, procurement law is designed to insure against corruption of the process, be it through bribery, government favoritism, or poor management of the procurement processes.  The law in turn provides disappointed bidders with an avenue through which they can challenge arbitrary and irrational government decisions, where disappointed bidders effectively act as "private attorney generals," keeping the system under perpetual scrutiny, ferreting out mistakes, and bringing to light bad government practices that impact their chances of receiving contract awards.  This the creates an effective system by which disappointed bidders keep in check the natural human tendency to award contracts based on favoritism.  So far, the system has worked rather effectively, though of course, any effectively run system has its associated costs.  Congress has, however, decided that the cost of expensive bid protest litigation is less than the cost of a corrupt or irrational decision-making process dealing with tens of billions of dollars.  As such, the Court must understand the broad purposes behind procurement law to effectively handle procurement cases.  The close scrutiny of disappointed bidders is balanced out by the deference afforded to Agencies.  We must remember that it is the agencies that have the authority, bestowed upon them by Congress and the President, to manage the procurement system.  The Court's role is to ensure fair and rational review by the agency in following the law in its decision-making processes.

  In this case, as well as the other cases related to Request for Proposal No. W52P1J-16-R-0001 ("RFP" or "Solicitation"), the six offerors spent many months and a large amount of money developing their proposals.  In general, the evaluation process worked well.  However, perhaps as a result of the inherent subjectivity and discretion in government contracting, a number of procurement ambiguities led to this extensive and expensive litigation.  The weight afforded by the United States Department of the Army ("Agency" or "Army") to each of the four evaluation factors led to many of the alleged issues currently in dispute.  The Solicitation prescribed the following evaluation factors, listed in descending order of priority: (1) Technical/Management Approach; (2) Past Performance; (3) Small Business Participation; and (4) Cost/Price.  Administrative Record (hereinafter "AR") 2624.  The ultimate award decisions confirm what the Solicitation stated—that the Technical/Management Approach was not just the most important factor, but that it was overwhelmingly more important than the other three factors.  While the Agency's emphasis on the Technical/Management Approach was neither arbitrary nor capricious, the Court believes the uncertain level of priority afforded that factor played a significant role in each offeror's decision to litigate this procurement, as did, of course, the huge amount of money at stake.

A final point. This litigation involves contracts worth up to $82 billion for work to be performed over the next decade.  While the Court detailed the reasons it has jurisdiction over these protests in *PAE-Parsons Global Logistics Services, LLC v. United States*, 145 Fed. Cl. 194 (2019), the Court finds that each of the protests related to this procurement concern disputes over the evaluation of offerors for the award of Indefinite-Delivery Indefinite-Quantity ("IDIQ") contracts, not disputes related to future task orders.  To hold that this Court lacks jurisdiction over this massive IDIQ procurement would effectively gut a significant part of federal procurement law by using the Federal Acquisition Streamlining Act ("FASA"), 10 U.S.C. § 2304c(e) (2018), to nullify a broad area of contract scrutiny.  This misuse of FASA would not streamline the procurement and protest process, but, rather, would eliminate a significant part of it, directly contradicting the legislative intent behind both FASA and the Competition in Contracting Act.

This action is before the Court on the parties' Cross-Motions for Judgment on the Administrative Record.  Plaintiff, AECOM Management Services, Inc. ("AECOM"), challenges the Army's decision to award IDIQ contracts to defendant-intervenors, Fluor Intercontinental, Inc. ("Fluor"), PAE-Parsons Global Logistics Services, LLC ("P2GLS"), Kellogg, Brown & Root Services, Inc. ("KBR"), and Vectrus Systems Corporation ("Vectrus"), under the RFP.  Complaint (hereinafter "Compl.") at 1.  Plaintiff asks this Court to do the following: (1) "[e]nter a declaratory judgment that the awards to KBR, Vectrus, Fluor and P2GLS are arbitrary and capricious"; (2) "[e]nter a declaratory judgment that the evaluation under the Technical Factor was disparate, based on unstated criteria[,] and arbitrary and capricious"; (3) "[e]nter a declaratory judgment that the evaluation under the Past Performance Factor was disparate, based on unstated criteria[,] and arbitrary and capricious"; (4) "[e]nter a declaratory judgment that the Agency failed to properly evaluate cost/price"; (5) "[e]nter a declaratory judgment that the evaluation under the Small Business Factor was arbitrary and capricious"; (6) "[e]njoin the Army from proceeding with the current awards to KBR[,] Vectrus, Fluor[,] and P2GLS"; and (7) award "[a]ny other relief that the Court deems appropriate."  Compl. at 44–45.  For the following reasons, plaintiff's Motion for Judgment on the Administrative Record is denied, and defendant and defendant-intervenors' Cross-Motions for Judgment on the Administrative Record are granted.

## I.     Background

On November 20, 2017, the Army issued a solicitation for the Logistics Civil Augmentation Program ("LOGCAP") V contract for logistics support services, including "'Setting the Theater,' supply operations, transportation services, engineering services, base camp services, and other logistics and sustainment support services."  Administrative Record (hereinafter "AR") 2510, 130447.  The Solicitation provided that the Army would issue a minimum of four and up to six IDIQ contract awards to cover the six Geographic Combatant Commands ("COCOMs") and Afghanistan, as well as concurrently award task orders for the seven regions covered under LOGCAP V.  AR 2511, 2624.  The six COCOMs include the following: (1) Northern Command ("NORTHCOM"); (2) Southern Command ("SOUTHCOM"); (3) United States European Command ("EUCOM"); (4) African Command ("AFRICOM"); (5) Central Command ("CENTCOM"); and (6) Pacific Command ("PACOM").

AR 2511.  Afghanistan fell under the regional umbrella for CENTCOM, and the Army awarded a separate LOGCAP V task order for Afghanistan.  *See* AR 2624–25.

The Army issued LOGCAP V awards on a best value basis according to the following factors: (1) Technical/Management; (2) Past Performance; (3) Small Business Participation; and (4) Cost/Price.  AR 2624.  The Technical/Management Factor was the most important non-price factor, followed by Past Performance and then Small Business Participation.  AR 2624.  The Army evaluated offerors' Regional Capabilities, management approaches, key initiatives, and Labor Staffing Models ("LSM") in assigning a Technical/Management rating.  AR 2626–27.  Additionally, in assigning that rating, the Army also considered the impact of each offeror's approach in the following LOGCAP risk areas: responsiveness, affordability, transparency, predictability, capability, accountability, and flexibility.  AR 2626–27.  The Technical/Management Factor evaluated (1) regional capabilities in support of setting and surging the theater and initial service support for Army deployment, and (2) management approach, key initiatives, and the LSM.  AR 2614–17.  The Solicitation did not assign weights to individual elements of the Technical/Management Factor.  *See* AR 2626–27 (listing each element of the Technical/Management Factor, but lacking any language indicating the relative weight of each factor comparatively).

The Solicitation required that each offeror provide a "base [LSM]" that was "consistent, scalable, and adjustable."  AR 2616.  The design of the base LSM needed to be such that it "predicts labor staffing mix (supervision, skilled trade, laborer, etc.), types (job description, labor category, etc.), and quantities."  AR 2616.  The Solicitation further directed that,

> [u]tilizing the base [LSM] above, the Offeror shall develop and provide one (1) Labor Staffing Approach [("LSA")] for each task order.  The [LSA] for each task order shall be produced by populating the base [LSM] with the unique requirements in the Government provided workload data and assumptions identified in Attachments 0002 thru 0010, respectively.

AR 2616.  In analyzing offerors' LSMs and LSAs, the Solicitation further directed that the Agency

> will evaluate the feasibility and confidence in the Offerors Labor Staffing Model and Approach to predict labor staffing mix, types, and quantities (troop to task) to meet the activated service requirements identified through the RFP, the [Performance Work Statement ("PWS")], and the associated technical exhibits, including the government provided workload inputs and assumption criteria identified in Attachments 0002 thru 0010, respectively.

AR 2627.  Moreover, the LSM "will be evaluated for consistency, scalability, and adjustability across the aforementioned broad range of requirements.  The evaluation will consider the quality and soundness of the supporting rationale utilized to develop the [LSM] and Approach."  *Id.*

Each offeror was to submit a "Labor Staffing Model Supporting Rationale," which was to include descriptions of the underlying bases used in the base LSM and an explanation of workload inputs, source data, and formulas/calculations an offeror used in estimating its

proposed quantities of labor for each LSA.  AR 2616.  In evaluating proposals, the Army evaluated an offeror's ability, "based on the uniqueness of approach, to collect, package, and deliver actionable information to the Government, resulting in deliverables under this contract." AR 2626.  The LSA was further evaluated on "how it addresses complexities of providing services during all phases: start-up operations; adjustment of services (i.e. adding/removing services, adding/removing workload); and drawdown of operations."  *Id.*

The Army received six proposals on February 26, 2018, all of which fell within the competitive range.  AR 191, 205–06.  Pursuant to the Solicitation, the Army conducted seven separate best value determinations, one for each COCOM and for Afghanistan.  AR 2624–25. Each offeror received a single adjectival rating for Past Performance, a single adjectival rating for Small Business Participation, and seven separate Technical/Management adjectival ratings for each COCOM and Afghanistan.  AR 2624.  On April 12, 2019, the Army awarded four IDIQ contracts and the associated task orders.  *See generally* AR 211, 70609–34.  AECOM was not among the awardees.

On August 12, 2019, plaintiff filed its Complaint with this Court, asking the Court to "declare that the Agency's award decision is arbitrary, capricious and contrary to well-established procurement law."  Compl. at 3.  On October 7, 2019, AECOM filed its Motion for Judgment on the Administrative Record, therein narrowing the focus of litigation to the issue of "[w]hether the Army's evaluation concerning [LSMs] contained material errors and deviated from the evaluation rules announced in the solicitation."  AECOM Management Services, Inc.'s Motion for Judgment on the Administrative Record (hereinafter "Pl.'s MJAR") at 2.  On October 22, 2019, defendant filed its Cross-Motion for Judgment on the Administrative Record.  *See generally* Defendant's Response in Opposition to Plaintiff's Motion and Cross-Motion for Judgment on the Administrative Record (hereinafter "Def.'s CMJAR").  That same day, defendant-intervenors filed their Cross-Motions for Judgment on the Administrative Record.  *See generally* Vectrus's Cross-Motion for Judgment on the Administrative Record and Response in Opposition to AECOM's Motion (hereinafter "Vectrus's CMJAR"); Fluor Intercontinental, Inc.'s Cross-Motion for Judgment on the Administrative Record and Response to AECOM's Motion for Judgment on the Administrative Record (hereinafter "Fluor's CMJAR"); Kellogg, Brown & Root Services, Inc.'s Cross-Motion for Judgment on the Administrative Record (hereinafter "KBR's CMJAR"); PAE-Parsons Global Logistics Services, LLC's Response to AECOM Management Services, Inc.'s Motion for Judgment on the Administrative Record and Cross-Motion for Judgment on the Administrative Record (hereinafter "P2GLS's CMJAR").

On November 4, 2019, plaintiff filed its Response and Reply.  *See generally* AECOM Management Services, Inc.'s Reply in Support of its Motion for Judgment on the Administrative Record and Response to Cross Motions.  On November 13, 2019, defendant and defendant-intervenors filed their respective Replies in Support of their Cross-Motions for Judgment on the Administrative Record.  *See generally* Defendant's Reply in Support of Cross-Motion for Judgment on the Administrative Record (hereinafter "Def.'s Reply"); Vectrus Systems Corporation's Reply in Support of its Cross-Motion for Judgment on the Administrative Record and Response in Opposition to AECOM's Motion (hereinafter "Vectrus's Reply"); Fluor Intercontinental, Inc.'s Reply in Support of Cross-Motion for Judgment on the Administrative Record (hereinafter "Fluor's Reply"); Kellogg, Brown & Root Services, Inc.'s Reply in Support of its Cross-Motion for Judgment on the Administrative Record (hereinafter "KBR's Reply");

PAE-Parsons Global Logistics Services, LLC's Reply in Support of its Cross-Motion for Judgment on the Administrative Record (hereinafter "P2GLS's Reply").  Oral Argument was held on November 20, 2019, and the parties' Motions are fully briefed and ripe for review.

## II.   Standard of Review

This Court's jurisdictional grant is found primarily in the Tucker Act, which gives the Court the power to

> render judgment on an action by an interested party objecting to a solicitation by a Federal agency for bids or proposals for a proposed contract or to a proposed award or the award of a contract or any alleged violation of statute or regulation in connection with a procurement or a proposed procurement.

28 U.S.C. § 1491(b) (2018).  This authority exists "without regard to whether suit is instituted before or after the contract is awarded."  *Id.*  Standing in bid protests is framed by 28 U.S.C. § 1491(b)(1), which requires that the bid protest be brought by an "interested party."  A protestor is an "interested party" if it is an actual or prospective bidder that possesses the requisite direct economic interest.  *Weeks Marine, Inc., v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (citing *Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006)).  "To prove a direct economic interest as a putative prospective bidder, [the bidder] is required to establish that it had a 'substantial chance' of receiving the contract."  *Rex Serv. Corp.*, 448 F.3d at 1308; *see Info. Tech. & Applications Corp. v. United States*, 316 F.3d 1312, 1319 (Fed. Cir. 2003) ("To establish prejudice, [the protestor] must show that there was a 'substantial chance' it would have received the contract award but for the alleged error in the procurement process."); *see also Statistica, Inc. v. Christopher*, 102 F.3d 1577, 1581 (Fed. Cir. 1996).

## III.   Discussion

In its original Complaint, AECOM alleged nine separate counts.  *See generally* Compl.  In its Motion for Judgment on the Administrative Record, plaintiff narrowed its focus to two specific questions.  *See* Pl.'s MJAR at 2.  First, plaintiff asks "[w]hether the Army's evaluation concerning [LSMs] contained material errors and deviated from the evaluation rules announced in the solicitation?"  *Id.*  Second, plaintiff asks "[w]hether, setting aside all other errors alleged in AECOM's Complaint, AECOM has demonstrated a substantial likelihood that it would have been in line for award but for those [LSM] evaluation errors?"  *Id.*  For the reasons that follow, the Court finds that the Army's award was neither arbitrary, capricious, nor contrary to law or the Solicitation requirements.

### A.  Comprehensive Labor Staffing Model

In its Motion for Judgment on the Administrative Record, plaintiff alleges that "the RFP is explicit that[] '[t]he Offeror shall provide one (1) [LSM] that predicts labor staffing mix (supervision, skilled trade, laborer, etc.), types (job description, labor category, etc[.]), and quantities.'"  Pl.'s MJAR at 6 (citing AR 2616).  Plaintiff interprets such a provision to mean that each offeror is required to "demonstrate that its Base LSM would work for all of the Agency's activities specified in the RFP and its Attachments."  *Id.* at 7 (emphasis omitted).  Plaintiff

further alleges that, because the Solicitation required that base LSMs be comprehensive, "[g]aps and inconsistencies in an Offeror's base LSM that made it unable to account for all of a task order's requirements should have been deficiencies, or at a minimum significant weaknesses, in that Offeror's proposal and certainly should have precluded assignment of an Outstanding rating for that Offeror's LSM." *Id.* at 8.

In response, the government argues that "[t]he plain language of the solicitation makes clear that the base [LSMs] were intended to be frameworks from which individual [LSAs] would be generated." Def.'s CMJAR at 13. Specifically citing to the Administrative Record, defendant posits that the "solicitation stated that offerors were to provide a base LSM that was 'consisten[t], scalab[le], and adjustab[le] across . . . a broad range of requirements.'" *Id.* (citing AR 2627). Vectrus echoes this argument and points out that "[o]fferors were to develop their LSAs 'by populating the base [LSM] with the unique requirements in the Government provided workload data and assumptions identified in Attachments 0002 thru 0010, respectively.'" Vectrus's CMJAR at 4 (citing AR 2616). The Court agrees with defendant and defendant-intervenors' understanding of the Solicitation's requirements.

In its Motion for Judgment on the Administrative Record, plaintiff also alleges that the Army's arguments at the Government Accountability Office ("GAO") were inconsistent with the plain language of the Solicitation and with the Agency's actions during the evaluation process. *See generally* Pl.'s MJAR at 8–14. In making its GAO-related arguments, plaintiff touches upon the allegation that there exists some latent ambiguity in the terms of the Solicitation related to the base LSMs. Pl.'s MJAR at 12. In determining whether ambiguity exists, the Court must look to whether the solicitation, taken as a whole, "plainly supports only one reading or supports more than one reading and is ambiguous." *Linc Gov't Servs., Inc. v. United States*, 96 Fed. Cl. 672, 708 (2010) (citing *NVT Techs., Inc. v. United States*, 370 F.3d 1153, 1159 (Fed. Cir. 2004)). However, the law is clear that "[d]ivergence between the parties' subjective interpretations does not, by itself, render a solicitation ambiguous." *Id.* (citing *Metric Constructors, Inc. v. NASA*, 169 F.3d 747, 751 (Fed. Cir. 1999)). Rather, "both interpretations must fall within a 'zone of reasonableness.'" *Metric Constructors*, 169 F.3d at 751. An interpretation is not reasonable if it "leaves a portion of the [solicitation] useless, inexplicable, void, or superfluous." *See Furniture by Thurston v. United States*, 103 Fed. Cl. 505, 512 (2012); *see also NVT Techs.*, 370 F.3d at 1159 ("An interpretation that gives meaning to all parts of the contract is to be preferred over one that leaves a portion of the contract useless, inexplicable, void, or superfluous."). Moreover, "[t]he conviction of [plaintiff] that [its] interpretation is the correct one, however deep that conviction may be, does not render [that] interpretation reasonable." *Linc*, 96 Fed. Cl. at 712.

The government's understanding is correct. While the Solicitation directed offerors to provide a base LSM that would "account[] for all activated service requirements identified through the RFP, the PWS, and the associated technical exhibits, including the government provided workload inputs and assumption criteria identified in Attachments 0002 thru 0010," the Solicitation also required separate LSAs for each task order. AR 2616. The Solicitation specifically states that "the [LSA] for each task order shall be produced by populating the base [LSM] with the unique requirements in the Government provided workload data and assumptions identified in Attachments 0002 thru 0010, respectively." *Id.* Nothing in the Solicitation required the base LSM to be pre-populated with all possible data inputs.

The Solicitation did not require that offerors propose LSMs that were pre-populated with all labor categories.  The plaintiff misunderstood the requirements associated with Attachment 23,which served to "provide a listing of all labor categories resulting from the [LSM]."  AR 2617.  While Attachment 23 was to include all of the information in the LSM, nothing in the Solicitation required that all of the information in Attachment 23 be comprehensively included within each offeror's base LSM.  Attachment 23 is exactly what its name suggests—an attachment.  The SSAC assigned a strength to KBR specifically because it provided an approach with a "transparent labor estimate" and "enhanced traceability."  AR 70331, 70344.  As the government points out, both KBR and Fluor provided rationales that were more comprehensive and traceable than that of AECOM.  Def.'s CMJAR at 22–23.

Finally, the Court concludes the Solicitation would not have contained the additional requirement of separate LSAs for each task order if the Agency intended for offerors to propose LSMs that were so comprehensive as to cover the work required under each and every task order.  Had that been the Agency's intent, the LSMs and LSAs would have been entirely duplicative, and the Court will not apply an interpretation that "leaves a portion of the contract useless, inexplicable, void, or superfluous."  *NVT Techs.*, 370 F.3d at 1159 (citing *Gould, Inc. v. United States*, 935 F.2d 1271, 1274 (Fed. Cir. 1991)).  Taken as a whole, the Solicitation clearly required that a single LSM was to be used across all task orders, but that each LSA was to be specifically populated to reflect the work required under the task order to which it applied.  Therefore, the Agency's analysis of offerors' LSMs was neither arbitrary, capricious, nor contrary to law or the terms of the Solicitation.

## B.  Technical/Management Evaluation

In addition to its general arguments related to the LSMs, plaintiff alleges that "AECOM has identified errors in KBR's and Fluor's LSMs."  Pl.'s MJAR at 14.  Specifically, plaintiff argues that both KBR and Fluor "failed to provide a comprehensive LSM, adding [COCOM]-specific labor categories to LSAs that were not traceable back to the LSM."  *Id.*  In response, the government argues that "the solicitation did not require each offeror to provide a comprehensive base LSM, which means the Army could not have erred by not finding that KBR or Fluor did not comply with the terms of the solicitation by not providing a comprehensive base LSM."  Def.'s CMJAR at 20–21.  The Court believes the implication the government's argument raises is significant—whether KBR and Fluor's LSMs complied with the terms of the Solicitation turns directly on whether or not the plain language of the RFP required submission of a single comprehensive LSM.  Essentially, plaintiff's arguments are predicated on an assumption that the Court will find in its favor regarding the base LSMs.  The Court's above finding—that the Agency's evaluation of base LSMs was consistent with the Solicitation—renders plaintiff's arguments related to KBR and Fluor's staffing plans meritless.  As such, the Court need not analyze those arguments.

Finally, plaintiff raised issues related to the mathematical formulae that KBR employed for calculating labor hours under its base LSM.  *See* Pl.'s MJAR at 22.  Specifically, based on its interpretation of the LSM requirements, plaintiff contends that inconsistencies between KBR's LSM and LSA resulted in "a substantial likelihood that [KBR] will either underestimate or overestimate its labor costs (or do both)."  *Id.*  In response, defendant argues that, even if plaintiff is correct regarding those alleged mathematical inconsistencies, such "minor errors do

not constitute significant prejudice because it is unlikely that these minor estimate discrepancies would have led the Army to conclude that KBR's technical proposal deserved a lower adjectival rating . . . or should have been rejected from the competition as unawardable." Def.'s CMJAR at 27.  Moreover, KBR points out that "[t]he cost impact of these discrepancies totaled a mere \$183,116 on NORTHCOM, EUCOM, and Afghanistan Task Orders, the total of which was \$1,846,378,374.  That equates to a difference in cost of 0.01%." KBR's CMJAR at 17 n.2.  Even if plaintiff's understanding of the LSM requirements was correct, such a cost deviation seems to this Court, *de minimis*, and, as both this Court and the United States Court of Appeals for the Federal Circuit have previously held, "[d]e minimis errors are those that are so insignificant when considered against the solicitation as a whole that they can be safely ignored." *Andersen Consulting v. United States*, 959 F.2d 929, 935 (Fed. Cir. 1992); *see also ManTech, Inc. v. United States*, No. 09-804, 2010 U.S. Claims LEXIS 107, at *26 (Fed. Cl. Apr. 19, 2010) (concluding that a *de minimis* error was without injury).  As a result, the Court will not sustain the plaintiff's protest on the grounds of *de minimis* errors.

### C. Prejudice, Injunctive Relief, and Corrective Action

In addition to its merits-based arguments, plaintiff asserts that it was prejudiced by the alleged procurement errors and that it is entitled to injunctive relief.  *See* Pl.'s MJAR at 25–27.  As the plaintiff has not established that more-than-*de-minimis* errors existed in the procurement, the Court need not address whether such errors were prejudicial.  Additionally, while the Court does not believe that the terms of the Solicitation regarding the LSMs were ambiguous, any argument that plaintiff was prejudiced but such an ambiguity has clearly been waived.  *See generally Blue & Gold Fleet, L.P. v. United States*, 492 F.3d 1308 (Fed. Cir. 2007).  Finally, as plaintiff has not succeeded on the merits, injunctive relief is inappropriate, and no further analysis of the remaining elements is necessary.  *See Mobile Med. Int'l Corp. v. United States*, 95 Fed. Cl. 706, 742 (2010) (citations omitted) (citing *Centech Grp., Inc. v. United States*, 554 F.3d 1029, 1037 (Fed. Cir. 2009)) ("[A] permanent injunction requires actual success on the merits."); *see also York Telecom Corp. v. United States*, 130 Fed. Cl. 186, 197–98 (2017) (citing *Nat'l Steel Car Ltd. v. Can. Pac. Ry., Ltd.*, 357 F.3d 1319, 1325 (Fed. Cir. 2004)) ("A plaintiff who cannot demonstrate actual success upon the merits cannot prevail upon a motion for permanent injunctive relief.").

On December 3, 2019, the Court held a status conference in all of the directly-related cases associated with the LOGCAP V procurement.  Although defendant demonstrated success on the merits in the case at bar, the Court determined that issues with the Agency's price reasonableness analyses warranted corrective action.  During the December 3, 2019 Status Conference, the Court indicated a need for corrective action.  On December 17, 2019, the Court issued an Order staying and remanding the case to the Agency for a period of forty-five days— up to and including January 31, 2020—for the Agency to conduct corrective action.  Order Remanding Case to Army, ECF No. 97 (hereinafter "Remand Order").  In that Order, the Court also directed the defendant to file a status report on or before February 7, 2020, "apprising this Court of the results of the Agency's corrective action and providing the Court with the Agency's new price reasonableness determinations." *Id.* at 2.  In turn, the Court afforded the plaintiff seven days—up to and including February 14, 2020—to respond to defendant's Status Report.  *Id.* at 2.  On February 5, 2020, defendant filed a status report regarding corrective action and

over 1,000 pages of supporting documentation.  *See* Defendant's Status Report Regarding Corrective Action, ECF No. 98; *see also* Associated Documents, ECF No. 99.  Plaintiff responded to defendant's Status Report on February 14, 2020, alleging that "the Army failed to even address the fatal defect in KBR's [LSM] that makes its proposed costs illusory" and reiterating its prior LSM arguments.  AECOM Management Services, Inc.'s Response to Defendant's Status Report, ECF No. 101 at 1.

The Court deemed corrective action necessary based on its determination that "the Agency failed to adequately conduct price reasonableness evaluations in violation of the terms of the Solicitation and Federal Acquisition Regulation ('FAR') 15.404-1."  Remand Order at 1. Nothing in the Court's Remand Order indicated the need for reevaluation of offerors' Technical/Management Approaches.  *See generally id.*  Upon careful review of defendant's Status Report and supporting documentation, the Court concludes that the Agency adequately evaluated price reasonableness in accordance with both the Solicitation and the FAR.  Moreover, the Court finds that none of the arguments in plaintiff's Response to defendant's Status Reports raise new issues requiring additional review by the Court.  As corrective action is complete and no further evaluation is necessary, the Court issues this Opinion.

## IV.     Conclusion

For the reasons set forth above, plaintiff's MOTION for Judgment on the Administrative Record is **DENIED**.  Defendant and defendant-intervenors' CROSS-MOTIONS for Judgment on the Administrative Record are **GRANTED**.  The Clerk is directed to enter judgment in favor of defendant and defendant-intervenors, consistent with this Opinion.

**IT IS SO ORDERED.**

s/ *Loren A. Smith*

Loren A. Smith,
Senior Judge